# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# PADUCAH DIVISION

**MANNING SHAW**                                                                                   **PLAINTIFF**

**v.**                                                                                                       **No. 5:19-cv-45-BJB**

**MCCRACKEN COUNTY FISCAL COURT,**                                                **DEFENDANTS**
**ET AL.**

## MEMORANDUM OPINION & ORDER

While in pretrial detention at the McCracken County Jail, Manning Shaw's ulcerative colitis flared up.¹ During the next two weeks, the Jail's medical staff moved Shaw in and out of medical observation, prescribed him a steroid, placed him on a restricted diet, and administered blood tests. Then, following an agreed order issued by the McCracken Circuit Court (DN 42-25), the Jail released him on medical furlough.

Shaw filed this lawsuit, claiming that his medical care was constitutionally inadequate and that McCracken County Jailer Tonya Ray, several "Unknown Medical Providers," and McCracken County itself should be held liable under 42 U.S.C. § 1983. Complaint ¶¶ 1–5. Ray and the unnamed medical providers, according to Shaw, exhibited deliberate indifference to and ultimately exacerbated his serious medical condition. *See* ¶¶ 24–28. But Shaw has not identified record evidence showing that he exhausted his administrative remedies as required by the Prison Litigation Reform Act. Nor has he pointed to evidence that would allow a reasonable jury to find the Defendants violated his constitutional rights. So for reasons explained here and during the hearing, summary judgment is due the Defendants, which renders moot their motion to exclude Shaw's expert. *See* DN 43. Given the Parties' agreement to dismiss all claims against the John Doe Defendants, DN 60, moreover, the Court now dismisses all claims against the unknown medical

---

¹ Shaw says he received a childhood diagnosis of ulcerative colitis and still suffers from it. *See* Complaint (DN 1) ¶ 10; Shaw Dep. (DN 42) at 27:10–12; Response (DN 52) at 3 n.2. At times, however, both Shaw and his mother have described his condition as Crohn's disease. *See* DN 52-6 at 1; Shaw Dep. at 31:7–12. Regardless of which term more precisely describes Shaw's condition, both seem to be used interchangeably in the record to describe the same overall condition and symptoms he suffered during his flareup in March and April 2018. *See* Shaw Dep. at 31:15 ("[S]ometimes people use those words interchangeably.").

1

providers and will enter a final judgment in the Defendants' favor in a separate order.[2]

## I. Factual Record on Summary Judgment

Most of the relevant facts are undisputed in the record presented at summary judgment. *See* FED. R. CIV. P. 56(a). After Shaw's arrest in February 2018, law enforcement booked him into the McCracken County Jail. DN 42-1 at 1. He was not experiencing any symptoms of ulcerative colitis when he filled out his booking paperwork. Shaw Deposition 24:2–12. Because Shaw figured he'd "bond straight out," he did not include any information about his history of ulcerative colitis on his intake form and described his health as good. *Id.* at 45:1–5; Intake Form (DN 42-4).

Jail staff first learned of Shaw's ulcerative colitis diagnosis through Facebook messages his mother sent them on March 29. DN 52-6. She asked them to check whether Shaw was experiencing diarrhea, bleeding, or other symptoms of a flareup. She explained that he'd needed blood transfusions during previous bouts, which he'd hidden in the past but could be triggered by stress and diet. *Id.* Lieutenant Keown assured Shaw's mother that she would personally check on Shaw and later relayed that Shaw said he was feeling fine; Keown said she told Shaw to "notify medical" if anything changed. *Id.*

Shaw submitted a sick call request on March 30—complaining of "[s]evere stomach pain due to Crohn's." Shaw Dep. 51:1–4; DN 42-11. He also told his mother that he'd been having stomach pain and had some bloody stools. Shaw Dep. 55:23–56:4. Jail staff took Shaw to the medical unit on April 1. *Id.* at 55:12–20; DNs 42-11 to -16 (medical-watch documentation). Because he'd reported blood in his stool, the staff placed him under medical observation in a "dry cell" (one without running water) to monitor his bowel movements for blood. Shaw Dep. 58:5–21. Jail staff checked on Shaw every twenty minutes while he was in the dry cell. *Id.* at 58:25–59:3. Once they confirmed blood in Shaw's stool, they prescribed prednisone—an anti-inflammatory steroid—and administered a twice-daily dose from April 3 to April 10. *Id.* at 62:13–63:6.

Shaw told his mother that the prednisone helped: "it's keeping me pretty straight." *Id.* at 63:12–13. He asked his mother to order noodles, bagels, peanut butter, cookies, and chips now that he could eat again after the flareup. *Id.* at 63:15–23. Much to Shaw's relief, he returned to his general-population cell on April 3. *Id.*

---

[2] The Parties submitted a proposed agreed order (DN 60) dismissing the unnamed Defendants. This followed the Court's oral ruling in favor of the named Defendants on summary judgment and order that Defendants file a status report concerning the unnamed "John Doe" defendants. DN 59.

2

at 63:24–65:6. Apparently he even obtained a jailhouse tattoo that week. *Id.* at 65:12–68:21.

While in his general-population cell, Shaw used a tablet computer provided to inmates for (among other things) filing grievances and making sick calls; he sent 63 emails in the course of 2 weeks on the device. *Id.* at 124:10–20. Between April 3 and 10 (when Shaw wasn't in medical observation), Shaw filed one grievance. *See* DN 42-17. A guard had approached Shaw's cell and asked "Okay. Who is the one that's shitting blood?" Shaw Dep. 72:7–18. Shaw looked around, identified himself, and went with the guard to the medical unit. *Id.* at 72:20–22. His grievance (DN 42-17) later complained that the other inmates "in the cell didn't need to know I was passing blood" and that "he could have called my name and took me to medical." This was the only grievance that Shaw filed, and he stated that he made no further attempts file another grievance using the tablet. Shaw Dep. 127:2–8.

Shaw returned to medical observation on April 9 after he reported that he'd passed more blood. *Id.* at 76:5–12. Once again, jail staff observed him every twenty minutes, and medical staff periodically checked his vital signs. DN 42-19. A prison doctor examined him—performing (among other things) a digital examination. Shaw Dep. 74:13–75:1. Despite Shaw's request to visit a hospital, the doctor concluded that he could receive effective treatment within the jail. DN 52-9 at 1.

Shaw's mother emailed McCracken County Jailer Tonya Ray on April 11 over concerns that he might need a blood transfusion due to his flareup. DN 52-7. She reported that Shaw had taken a steroid, which wasn't working, and asked Ray to make sure that the staff checked his blood levels. *Id.* The same day, the medical staff placed Shaw on a Crohn's diet. Shaw Dep. 82:20–22; DN 42-22. The next day they drew his blood and released him from medical observation. Shaw Dep. 87:24–88:11.

Early on April 13, Shaw's mother emailed Judge Executive Bob Leeper demanding that Shaw be taken to a hospital. DN 52-8. Leeper forwarded the email to Ray, Tray English, and Stephen Carter; English responded a few hours later. DN 52-9. In the interim, Shaw saw another nurse and asked for a wheelchair so he could attend a meeting with his lawyer. Shaw Dep. 88:16–22. The nurse denied his wheelchair request because his "gait [was] steady with no complications noted" and he showed no signs of respiratory or acute distress. DN 42-24. Later that day, the McCracken Circuit Court entered an agreed order (DN 42-25) granting Shaw a medical furlough to visit a hospital for evaluation.

Shaw asserts, and Defendants don't dispute, that the hospital diagnosed him that day with ulcerative colitis, rectal bleeding, and dehydration. Response at 11. The hospital placed him on steroids and antibiotics and ultimately transferred him to another hospital for more specialized care. *Id.* at 11–12. Shaw now receives medication to treat chronic ulcerative colitis.

3

## II. This Lawsuit

Shaw eventually pled guilty to operating a vehicle without tail lamps and possessing controlled substances. He received a sentence of incarceration, which he was serving at the Crittenden County Detention Center when he filed this lawsuit. Complaint ¶ 2, DN 41-19 (Judgment on Guilty Plea).

He sued McCracken County Jailer Tonya Ray (in her official and personal capacities), the McCracken County Fiscal Court, and unknown medical providers for inadequate medical care that he says "constituted cruel and inhuman punishment in violation of the Eighth Amendment." Complaint ¶¶ 3–5, 32.[3] He also sued Ray (in her personal capacity) and the medical providers for intentional and negligent infliction of emotional distress. ¶¶ 33–35. Finally, Shaw sued Ray (in her personal capacity) for failure to supervise. ¶¶ 36–39. Shaw has since dropped his emotional-distress claims, Response at 35 n.7, and all claims against the unknown medical providers, DN 60. That leaves only the claims against Ray and McCracken County.[4]

---

[3] Shaw hadn't been convicted when these events occurred. Since he was in pretrial detention rather than serving a sentence of incarceration, the Fourteenth rather than Eighth Amendment applies. *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 382 n.3 (6th Cir. 2004) ("The Eighth Amendment does not apply to pretrial detainees."). Although he technically should have pled his deliberate-indifference claim under the Fourteenth Amendment, substantively this makes little difference: "the Fourteenth Amendment affords pretrial detainees a due process right to adequate medical treatment that is analogous to the Eighth Amendment rights of prisoners." *Id.* *Compare, e.g.*, *Grote v. Kenton County*, 85 F.4th 397, 405 (6th Cir. 2023) ("To make out [a Fourteenth Amendment] claim, a plaintiff must demonstrate (1) an objectively serious medical need; and (2) that the defendants, analyzed individually, acted (or failed to act) intentionally and either ignored the serious medical need or recklessly failed to act reasonably to mitigate the risk the serious medical need posed.") (quotation marks omitted), *with Richmond v. Huq*, 885 F.3d 928, 938–39 (6th Cir. 2018) ("An Eighth Amendment claim … requires the plaintiff to show that the medical need at issue is sufficiently serious" and "that the official knew of and disregarded an excessive risk to inmate health or safety.") (cleaned up). Nothing about this case indicates that any difference between the two standards would be relevant here. So the Court simply construes the claim as if he pled it correctly, rather than dismissing for futile repleading. *See, e.g.*, *Gibson v. McCreary County*, No. 6:19-cv-139, 2022 WL 488011, at *6 (E.D. Ky. Feb. 17, 2022) (construing complaint under Fourteenth Amendment because plaintiff was a pretrial detainee).

[4] Shaw's official-capacity claims against Ray duplicate his claims against McCracken County and do not warrant separate treatment. Any judgment against Ray in her official capacity would, "in reality, be a judgment against [the County] and [would] only be collectible against" the County. *Baar v. Jefferson County Bd. of Educ.*, 476 F. App'x 621, 635 (6th Cir. 2012).

### III. Shaw's Remaining Claims Fail on Summary Judgment

**A. Exhaustion.** The analysis begins and effectively ends with Shaw's failure to file a grievance form related to the timeliness or adequacy of his medical care.

The Prison Litigation Reform Act provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner ... until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "This mandatory exhaustion requirement acts as a gatekeeper" of sorts. *Lamb v. Kendrick*, 52 F.4th 286, 292 (6th Cir. 2022). It is designed "to allow prison officials a fair opportunity to address grievances on the merits, to correct prison errors that can and should be corrected and to create an administrative record for those disputes that eventually end up in court." *Reed-Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010) (quotation marks omitted). To comply, "an inmate must take advantage of each step the prison holds out for resolving the claim internally and by following the critical procedural rules of the prison's grievance process to permit prison officials to review and, if necessary, correct the grievance on the merits in the first instance." *Lamb*, 52 F.4th at 292 (quotation marks omitted). Failure to do so generally precludes relief.

But exceptions exist. "[A]n inmate must only exhaust available remedies, not unavailable ones." *Lamb*, 52 F.4th at 292. In other words, an inmate's failure to exhaust doesn't end the case if the prison's grievance process "operates as a simple dead end," is "so opaque" or "so confusing" that no ordinary prisoner could navigate it, or is effectively unavailable because "prison administrators thwart inmates from taking advantage of [it]." *Id.* Because failure to exhaust "is an affirmative defense[,] defendants have the burden to plead and prove [it] by a preponderance of the evidence." *Id.* Correspondingly, "if the plaintiff contends that he was prevented from exhausting his remedies, the defendant must present evidence showing that the plaintiff's ability to exhaust was not hindered." *Id.* at 295 (quotation marks omitted).

That tracks the scenario here: the Defendants contend Shaw failed to fully pursue his grievance before coming to court, Shaw responds that the grievance system was effectively unavailable, but the summary-judgment record makes clear that Shaw didn't try to follow all the steps in the grievance policy. Because the record shows "no genuine dispute of material fact that the plaintiff failed to exhaust," summary judgment is appropriate. *Id.* at 292 (quoting *Does 8-10 v. Snyder*, 945 F.3d 951, 961 (6th Cir. 2019)).

5

The McCracken County Jail had a three-step grievance system that applies to this dispute.[5] "To file a grievance, [inmates] must first make [their] complaint to the officer assigned to [their] area." DN 42-3 at 4. If this does not resolve the problem, they proceed to the second step: filing a "grievance form." *Id.* Inmates must "[c]omplete the form and return it to the shift that issued it to you." *Id.* The Grievance Hearing Officer then has ten days to respond. Third, inmates unsatisfied with the Grievance Hearing Officer's response may appeal. *Id.*

Shaw argues that he complied with step one: "every time he saw a guard, he told them 'I need to go to the hospital.'" Response at 15 (citing Shaw Dep. 117:18-24). The Defendants don't contest that these requests amounted to an initial "complaint to the officer assigned." DN 42-3 at 4

As to step two, Shaw concedes he didn't complete a grievance form for the hearing officer to review. So no factual dispute exists regarding Shaw's compliance with the Jail's policy. Rather, Shaw insists that his non-compliance is excusable because "an inmate must only exhaust available remedies, not unavailable ones." Response at 14 (quoting *Lamb*, 52 F.4th at 292). "[T]he grievance system," his brief contends, "was unavailable to Mr. Shaw despite his efforts to use it." *Id.* According to his brief, he "asked for paper grievance forms pursuant to the policy," but the guards "directed him to use the tablets to which the jail was transitioning for grievances." Response at 15 (citing Shaw Dep. 122:4–16, 122:23–123:5). "The tablets frequently did not work, however," at least according to Shaw's brief. *Id.* In support, he offers an affidavit from an employee who criticizes the Jail's handling of grievances.

Shaw has failed to support his position—that the grievance process was unavailable to him—with record evidence sufficient to create a genuine issue of material fact. First, nothing in the record indicates Shaw actually tried to use the tablet to file a grievance. When asked by his own lawyer whether he'd tried to file a grievance in response to the guards' failure to take him to the hospital, Shaw didn't say he did. *See* Shaw Dep. 122:4–16 (speaking generally about what the deputy jailer "will tell you" "if you asked for a grievance paper"). Nothing else in the record indicates that Shaw attempted to use a tablet to file a grievance, that the tablet malfunctioned, or that Shaw asked for a paper form in response.

---

[5] This grievance policy included an exception for "medical decisions made by a physician." DN 42-3 at 4. Neither side has treated this provision as applicable to Shaw's claims in this case, which appear to concern only decisions made by non-physicians at the Jail.

6

To the contrary, he admitted that he "probably could have" but "didn't click on" the tablet application for filing grievances to see if worked. Shaw Dep. 126:15–127:8.[6] This admission contradicts his brief's statements regarding Shaw's "efforts to use" the grievance process. Shaw doesn't contest that jail staff directed him to use a tablet to file any grievances. *Id.* at 122:6–7 ("During that time, like you said, they were transitioning from paper to tablet."). Or that he had regular access to the tablet. *Id.* at 124:16–20. Or that he had experience enough to know how to file a grievance, and actually did so. *Id.* at 72:7–22 (bloody-stool comment and grievance); DN 42–16. Or that he "probably could have" opened the application to file a grievance but "didn't click on it to see if it would open." Shaw Dep. 127:3–8. This is all "evidence showing that [Shaw's] ability to exhaust was not hindered." *See Lamb*, 52 F.4th at 295.

That is dispositive under the PLRA. "Even if an inmate has evidence to show that an administrative procedure was unavailable,"—evidence that Shaw lacks—"he is not automatically absolved from the PLRA's exhaustion requirement." *Id.* at 293. Instead, the Sixth Circuit "requires inmates to make affirmative efforts to comply with the administrative procedures before analyzing whether the facility rendered these remedies unavailable." *Id.* (quotation marks omitted). And nothing in the record indicates Shaw "ma[d]e affirmative efforts" to comply with step two of the grievance system. *Id.* This distinguishes Shaw's case from others in which inmates alleged "specific facts" about their attempts to file a grievance. *E.g.*, *id.* at 297–98 ("Lamb's affidavit alleged specific facts about why he relied solely on … correctional officers for step two grievance forms and how those officers … repeatedly prevented him from exhausting his remedies by refusing to provide those forms upon request."). Here, by contrast, the specific facts indicate that Shaw "didn't click on [the grievance application] to see if it would open…." Shaw Dep. 126:15–127:8.

---

[6] The relevant exchange from Shaw's Deposition:

Q: So the app – if the tablet was working for you to send e-mails, it would have likely been working for you to file a grievance as well?

A: Sometimes it would work for the e-mail; sometimes it wouldn't work for the music.

Q: Okay.

A: Sometimes it would work for the music and sometimes it wouldn't work for the game.

Q: Okay.

A: You could only open one at a time, and you only get 15 minutes on it.

Q: Right. But regardless, during these times when you sent and received 63 e-mails, you could have attempted to file a grievance, you just didn't do so, right, other than the one that we talked about here today?

A: I didn't click on it to see if it would open, so I probably could have.

7

Second, even if Shaw had pointed to evidence that he "did *something*" to file a grievance form, *Napier v. Laurel County*, 636 F.3d 218, 224 (6th Cir. 2011) (emphasis in original), his position fails for an additional reason: nothing in the record indicates that the grievance procedure was unavailable to him. Shaw's brief argues that the jail was transitioning from paper to tablet-based grievance forms during his illness. Response at 7. These tablets, according to Shaw, weren't reliable, yet the jail refused to provide paper forms. Shaw Dep. 122:4–16, 122:23–123:5. So he believes the jail effectively prevented him from exhausting its process.

But undisputed record evidence shows that he had access to the tablets (and thus the grievance application) throughout his incarceration. During the period when he was sick, he successfully filed a grievance against a deputy jailer who identified Shaw as "the one who's shitting blood" before taking Shaw to the medical unit. *Id.* at 70:8–16; DN 42-16. He also sent 63 emails from the tablet during his 2-week flare-up. Shaw Dep. 124:10–20. This is the only evidence in the record regarding how the tablets actually functioned—and it indicates that they worked. Nothing besides the arguments in his brief (which obviously don't matter at summary judgment) and his testimony about the tablets' general unreliability supports the notion that the Jail's tablets rendered the process unavailable to Shaw.

Third, the declaration from Deputy Jailer April Clark is too generic to offer Shaw any help. It states that "[g]rievances are not treated as they should be per the McCracken County Jail Grievance Policy." DN 52-5 at 1. Staff often ignored them, according to Clark, "based upon the inmate's character and complaint." *Id.* at 2.

This critique doesn't address the key question whether the process was unavailable, however. It discusses the grievance system under a different head jailer. It does not mention the tablets *at all*. DN 52-5. And it addresses how jail staff handled grievance forms that had already been filed (for example, Shaw's grievance against the deputy jailer), not grievances that were never filed in the first place. Most importantly, the declaration never says the Jail prevented inmates from filing grievances. This distinction was critical in a recent Sixth Circuit decision. In *Ryan v. G. Robert Cotton Correctional Facility*, Ryan argued that prison officials who "declined to respond" to his grievance had effectively denied him a remedy by failing to respond. No. 22-1808, 2023 WL 6059802, at *3 (6th Cir. 2023). His ability to appeal, however, meant that the grievance "process was available to Ryan notwithstanding any alleged failure by prison officials to respond to his grievances at Step I." *Id.* Shaw doesn't contend he filed, much less appealed. So he can't point to record evidence sufficient to support a finding that the process was futile.

By pointing to the shortcomings in the record evidence regarding any grievance filed by Shaw, Defendants have carried their burden to show that he failed to exhaust available administrative remedies and that Shaw's "ability to exhaust was not

hindered." *See Lamb*, 52 F.4th at 295. So summary judgment is appropriate under the PLRA's exhaustion requirement.

**B. Merits.** Even if exhaustion weren't an issue, summary judgment would still be appropriate. Shaw asserts two claims against Ray—for deliberate indifference and failure to supervise—and one against the County for municipal liability based on its purportedly unconstitutional policies. But Shaw has failed to identify record evidence to support any of these claims.

**1.** Shaw argues that Ray "exhibited deliberate indifference to Mr. Shaw's condition by failing to take his complaints seriously and failing to demand proper diagnostic review of his complaints." Response at 23. But no record evidence indicates that a reasonable jury could find that Ray "(a) acted intentionally to ignore [Shaw's] serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to" Shaw. *Greene v. Crawford County*, 22 F.4th 593, 607 (6th Cir. 2022). He points only to Ray's alleged failure to "request any reports or ask any questions" of medical staff, "even as Mr. Shaw and his mother made [Ray] aware of his ongoing issues and deteriorating condition." Response at 29. Shaw insists that "[t]he choice to ignore complaints without even assessing them demonstrates objectively unreasonable conduct from those who had exclusive control over Mr. Shaw's ability to attend to his medical needs." *Id.*

But unrebutted facts in the record indicate that Ray didn't exhibit deliberate indifference by choosing "to ignore complaints without even assessing them." *Id.* Shaw has not identified any record evidence regarding information known to—but ignored by—Ray that should've led her to second guess the medical staff's prescribed treatment. "A non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he reasonably deferred to the medical professionals' opinions." *McGaw v. Sevier County*, 715 F. App'x 495, 498 (6th Cir. 2017) (cleaned up); *see also, e.g.*, *Bond v. Aguinaldo*, 228 F. Supp. 2d 918, 920 (N.D. Ill. 2002) ("Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals.").

What's more, Shaw agrees he received treatment on multiple occasions inside (and eventually outside) the jail. The undisputed record also shows that Ray and her colleagues responded to inquiries from Shaw's mother, addressed concerns raised by county officials, and followed the advice of the Jail's medical providers. *See* DN 52–6 (responding to Shaw's mother); DN 52–9 (responding to county officials); Shaw Dep. 58:5–21, 58:25–59:19, 62:13–63:6 (describing observation in a dry cell and prednisone treatment). Indeed, Shaw's lawyer conceded at oral argument (*see* DN 59) that he didn't dispute the Jail staff did *something* in response to the medical concerns and requests they heard.

**2.** The supervisory claim against Ray in her personal capacity fails for largely the same reasons. Shaw argues that Ray "failed to exercise her duty to ensure he was provided Constitutionally sufficient medical care by failing to supervise, monitor, or otherwise ensure that the Defendant Unknown Medical Providers carried out their duties in a lawful manner." Response at 34. Yet Shaw hasn't identified evidence that Ray "somehow encouraged or condoned the [unconstitutional] actions of [her] inferiors" as is required to establish supervisory liability. *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006). Supervisory liability "has sharp limits. It will not attach for a mere failure to act." *Crawford v. Tilley*, 15 F.4th 752, 766 (6th Cir. 2021) (quotation marks omitted). Instead, it requires "active unconstitutional behavior on the part of the supervisor." *Id.* at 761 (quotation marks omitted). Shaw identifies none. Absent at least some evidence of culpable conduct on Ray's part, summary judgment is appropriate on this claim.

**3.** Finally, Shaw's municipal-liability claim fails because he has not identified evidence to support his contention that McCracken County has "a policy of contracting out medical services and ignoring results." Response at 33. To establish municipal liability, "a plaintiff must identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 363–64 (6th Cir. 1993) (quotation marks omitted). Far from illustrating a policy of ignoring results, the evidence presented by Shaw and discussed above shows county officials responding to the information they received and engaging with Shaw, his mother, and the medical staff. Lieutenant Keown checked on Shaw shortly after communicating with his mother. DN 52-6. Jail staff took Shaw to medical shortly after receiving his sick call. DN 42-12. Medical staff recommended and administered steroids to manage Shaw's symptoms. DN 42-15. And when his symptoms came back, jail leadership continued to follow the advice from medical providers (special diet and more testing) until Shaw's lawyer and the Commonwealth negotiated his release. DNs 42-20 to -24. Importantly, Shaw concedes that he was not aware of any instance in which jail staff did not do "something that the medical department told them to do." *See* Shaw Dep. 87:19–23. So the record couldn't reasonably support a jury finding that the County contracted out services in order to ignore them, or that it ignored the work or results of its contracted health providers, as Shaw contends.

## CONCLUSION

The Court grants Defendants' motion for summary judgment (DN 41), denies as moot the motion to exclude (DN 43), and dismisses all claims against the unknown medical providers (DN 60). A separate final judgment will follow.

Benjamin Beaton, District Judge
United States District Court

February 6, 2024